1
2
3
4
5
6
7

**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATION, et al.,

   Plaintiffs,

 v.

GARY LOCKE, et al.,

   Defendants.
_____/

No. C 10-04790 CRB

**ORDER GRANTING FEDERAL
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

   This case calls upon the Court to wade into the murky waters of administrative review of comprehensive agency action.  It concerns challenges to two Amendments (20 and 21) to the Pacific Coast Groundfish Fishery Management Plan ("FMP").[1]  The FMP covers United

---

[1] Plaintiffs are (1) Pacific Coast Federation of Fishermen's Associations, "an umbrella organization comprised of 14 commercial fishing association and groups, with a collective membership of over 1200 primarily non-trawl fishing men and women . . . in California, Oregon, and Washington, the states bordering the Pacific Coast groundfish fishery"; (2) Port Orford Ocean Resource Team, and (3) San Francisco Crab Boat Owners Association.  Mot. for Summ. J. (dkt. 71) at 7.  Amicus Food and Water Watch filed a brief in support of Plaintiffs' Motion for Summary Judgment, as did United States Representatives Peter Defazio and Mike Thompson.

   Defendants are Gary Locke in his official capacity as Secretary of the Department of Commerce, National Marine Fisheries Service, and the National Oceanic and Atmospheric Administration.  United Catcher Boats, Midwater Trawlers Cooperative, and the Environmental Defense Fund filed an amicus brief in support of Federal Defendants' Motion for Summary Judgment.

   The Court was supplied with extensive, thorough, and well-argued briefing from all parties and appreciates the helpful input from amicus curiae.

United States District Court
For the Northern District of California

States territorial waters off the coast of Washington, Oregon, and California and includes over 90 groundfish species.  B14; B1:*146-153.[2]

Amendment 20 is directed toward the trawl section[3] of the fishery and creates a Limited Access Privilege Program ("LAPP") involving Individual Fishing Quotas ("IFQ").[4] The purpose of Amendment 20, broadly speaking, is to "rationalize" the trawl sector of the fishery, which has become "economically unsustainable due to the number of participating vessels, excess capacity, a regulatory approach that constrains efficiency, and the status of certain groundfish stocks along with the measures in place to protect those stocks." D45:*30.

Amendment 21 is an "intersector" allocation of total catch allowance for the groundfish fishery.  It grants 90% of the total allowable catch of specified groundfish to the trawl sector and 10% to the non-trawl sector.  That allocation is based on historical catch rates, under which the trawl sector dominated the fishery.

Plaintiffs' overarching challenge to these Amendments is that their outcome was predetermined, and the National Marine Fisheries Service ("NMFS") and the Pacific Fishery Management Council ("the Council") did not go through a real deliberative process before enacting them.  Largely because of this preordained outcome, Plaintiffs assert that Federal Defendants violated the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") and the National Environmental Policy Act ("NEPA").

* * *

Federal Defendants could have gone about the process of developing Amendments 20 and 21 differently and perhaps avoided at least some of the issues presently before the Court.

---

[2] The Court adopts the record citation system agreed to by the parties.  Citations to the administrative record include the unique document identifier followed by a colon and then the pinpoint citation within the document.  (E.g. B22:10.)  For documents with numerous attachments or conflicting page numbers, the pinpoint citation is to the "absolute" page number identifiable in the document's .PDF format and is denoted with an asterisk.  (E.g. B22:*1000.)

[3] Groundfish trawling is dragging a net on or near the ocean floor.

[4] A "limited access privilege" is a federal permit that provides a person an exclusive privilege to harvest a specific portion of a fishery's total allowable catch.  An IFQ program is a type of LAPP.

United States District Court
For the Northern District of California

But the Court is not called upon to decide whether a different process might have been utilized or whether the path ultimately chosen by Federal Defendants is the wisest policy. Rather, the task before this Court is to determine whether Federal Defendants ran afoul of the MSA or NEPA.  In the Court's view, they did not.  Accordingly, Federal Defendants are entitled to Summary Judgment.

# I.     BACKGROUND[5]

## A.     The Fishery

The Council manages the Pacific Coast Groundfish Fishery.  See 16 U.S.C. § 1802(a)(1)(A).[6]

The fishery is made up of groups of participants ("sectors") that use different types of fishing gear/methods.  The trawl sector accounts for the vast majority of the catch of most groundfish species.  See 75 Fed. Reg. at 60888 (response to comment 81).  The trawl sector is made up of three types of vessels: (1) shore-based processors; (2) mothership processors (vessels that process catch offshore at a mothership); and (3) catcher-processor vessels that catch and process onboard.

The non-trawl sector fishes with pots and longline gear and mostly targets the high-value sablefish.  B22:132-37.

The fishery is not operating effectively for the fish or the fishing industry.  B22:516; B22:14.  Indeed, the Secretary of Commerce declared the fishery a federal disaster area in 2000, and the fishery was viewed as economically unsustainable.  B22:15; D45:*30.  Further, at the time of the enactment of Amendments 20 and 21, seven species managed under the

---

[5] The administrative record in this case is extensive.  This background section is not intended to be an exhaustive review of that record.  Further, the Court has simplified certain matters for the sake of providing the reader a reasonably accessible framework within which to place the legal discussion that follows.

[6] The Council has amended the FMP several times.  For example, Amendment 17 created a biennial framework for a harvest specification process; Amendment 16 contained rebuilding plans for overfished species; Amendment 18 provided direction for bycatch monitoring and mitigation; and Amendment 19 contained provisions designating essential fish habitat and minimization of adverse impacts.  B14:iii-iv.

FMP had been designated as overfished and are managed under rebuilding plans. B14:21-52; See 50 C.F.R. § 660.40.

In September 2003, in response to problems in the fishery generally and the trawl sector specifically, the Council started work on a trawl rationalization program and established a committee to consider issues related to developing an IFQ program and make recommendations as to program details. B22:15, 18; H2:44-45.  In May 2004, the NMFS and the Council published a notice of intent to prepare an Environmental Impact Statement ("EIS") to analyze LAPP proposals for the trawl fishery.  See 69 Fed. Reg. 29,482.

In a scoping document released the following month, the Council determined that the trawl fishery faced "serious biological, social, and economic concerns." H50:*6; H117:*11. In particular: (1) uncertain bycatch rates; (2) limited incentives for bycatch reduction; (3) loss of opportunities to harvest target species; (4) pressure regarding bycatch estimates; (5) inability to accommodate the variety of harvest patterns of trawlers; (6) inability to respond to market and other variables; and (7) community uncertainty.  In response to the foregoing, the Council developed the following goal: "Create and implement a capacity rationalization plan that increases net economic benefits, creates individual economic stability, provides for full utilization of the trawl sector allocation, considers environmental impacts, and achieves individual accountability of catch and bycatch." I30:*5.

Amendment 20 was enacted following a lengthy process.  It divides the trawl sector into three main programs: shorebased to be managed by IFQs; mothership; and co-op programs. B26:3, *13.  It includes an individual accountability system whereby all catch by shorebased trawl vessels count against the individual trawl participant's shares, including retained and discarded catch. B26:*23.  Amendment 20 provides for observer coverage on all vessels and monitoring of each vessel's offload. Id. at *16.[7]  Because discards by shorebased trawlers count against their quotas, the belief is that they will have a strong incentive to fish more responsibly. B26:*23; B22:*67.  Amendment 20 provides that

---

[7] Under the old system, shorebased trawlers were allowed to fish up to bimonthly trip limits and had no direct accountability for discards. B22:*65.

4

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

trawlers with limited entry permits receive an initial allocation of 80% of the whiting and 90% of the nonwhiting Quota Share (sometimes referred to as "QS"). B26:*15. Eligible shoreside processors were granted 20% of the whiting Quota Share, and 10% of the nonwhiting Quota Share was set aside as part of an Adaptive Management Program ("AMP") to be used after program implementation to address adverse impacts, such as community instability, processor instability, and conservation. B22:58. Quota Share is non-transferrable in the first two years of the program. B22:509. After that, transfer is permitted, and generally speaking anyone eligible to own a U.S.-documented fishing vessel will be able to acquire Quota Share, which is highly divisible. 50 C.F.R. § 660.140(d)(3)(ii)(B)(2). These provisions allow for new entrants into the fishery. B22:59, A-264, A-283.

In conjunction with and to support the trawl rationalization plan, the Council determined that it made sense to redesign the way that it allocated intersector allotments of the total allowable catch in the fishery (i.e., allotments between the trawl and non-trawl sectors). H45:31-32. Under the FMP before Amendment 21, the annual harvest specification for each species was allocated between sectors by taking the optimum yield and subtracting from it amounts of fish necessary for tribal fisheries, bycatch for exempted fishing permits, estimates of research catch, recreational catch, and bycatch in non-groundfish fisheries. B1; B14. The resulting number, called the Commercial Harvest Guideline, was then divided between the limited entry and open access sectors and then further divided within the limited entry sector between trawl and non-trawl and then between whiting and nonwhiting within the trawl fleet.

In November 2005, the NMFS and the Council published a Notice of Intent in the Federal Register announcing an intention to prepare an EIS to analyze alternatives to establish intersector allocations. See 70 Fed. Reg. 70,054. By November 2007, the Council decided a preliminary range of intersector allocation alternatives and reduced the scope of the proposed intersector allocation actions by removing the non-trawl-dominant overfished species. H289:29-30. The Council finally adopted its preferred alternative for the limited entry trawl and non-trawl allocations in April 2009. H512:22-32.

5

1

**B.      Statutory Background**

2

**1.      The MSA**

3      The MSA was enacted in 1976 to "conserve and manage the fishery resources found

4  off the coasts of the United States" and "to promote domestic commercial and recreational

5  fishing under sound conservation and management principles."  16 U.S.C. § 1801(b)(1), (3).

6  The MSA established eight regional fishery management councils.  These councils are tasked

7  with developing fishery management plans and amendments to "achieve and maintain, on a

8  continuing basis, the optimum yield from each fishery."  16 U.S.C. §§ 1801(b)(4),

9  1852(a)(1), (h)(1).

10      If a council limits access to a fishery via a LAPP, it must "take into account" seven

11  factors enumerated in Section 303(b)(6).  16 U.S.C. § 1853(b)(6) (participation in the fishery;

12  historical fishing practices; economics; capability of vessels to engage in other fisheries;

13  cultural and social framework and affected fishing communities; fair and equitable

14  distribution of access privileges; other relevant considerations).  In addition, amendments to

15  fishery management plans must be consistent with ten National Standards.  16 U.S.C. §

16  1851(a)(1)-(10).[8]

17

**2.      The NEPA**

18      NEPA requires federal agencies to examine the environmental impacts of their

19  proposed actions and to notify the public about those impacts.  42 U.S.C. § 4332(C).  NEPA

20  requires an agency to prepare an EIS when it proposes a "major Federal action[] significantly

21  affecting the quality of the human environment[.]" 42 U.S.C. § 4332(C).  An EIS must

22  "provide [a] full and fair discussion of significant environmental impacts" to "inform

23  decisionmakers and the public of the reasonable alternatives which would avoid or minimize

24  adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

25

26      [8] These standards concern (1) conservation and management measures to prevent overfishing
   while achieving optimum yield; (2) use of "best scientific information available" in developing
27  amendments; (3) coordinated treatment of stocks of fish; (4) fair and equitable allocation of privileges
   reasonably calculated to promote conservation and avoid excessive consolidation; (5) economic
28  efficiency; (6) allowance of variation in fisheries, fishery resources, and catches; (7) minimization of
   costs and duplication; (8) the importance of fishery resources to fishing communities; (9) reduction of
   bycatch and bycatch mortality; and (10) promotion of safety of human life at sea.  Id.

United States District Court
For the Northern District of California

1  NEPA is a process prescribing statute requiring agencies to take a "hard look" at

2  environmental impacts. <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 350-

3  51 (1989). NEPA does not mandate particular outcomes. <u>Id.</u>

**C.    This Lawsuit**

5  Plaintiffs filed suit in late October 2010, "challeng[ing] actions by the Defendant

6  federal fishery agencies to restructure the Pacific Coast groundfish fishery by creating and

7  distributing individual fishing quota [] shares to qualifying trawl permit owners, locking into

8  place the dominance of bottom trawl fishing in this major ocean fishery." Compl. (dkt. 1) ¶

9  1. Specifically, Plaintiffs are challenging "(i) the promulgation of three sets of regulations on

10  October 1, 2010, December 15, 2010, and December 30, 2010, implementing the IFQ

11  program . . . and (ii) the underlying approvals of Amendments 20 and 21 of the Pacific Coast

12  Groundfish Fishery Management Plan . . . ." First Am. Compl. (dkt. 28) ¶ 3. The IFQ

13  program went into effect on January 1, 2011. <u>Id.</u>

14  Plaintiffs sought expedited treatment of this matter pursuant to 16 U.S.C. §

15  1855(f)(4).[9] <u>Id.</u> ¶ 85. Plaintiffs filed their Motion for Summary Judgment on April 8, 2011,

16  and Federal Defendants cross moved for Summary Judgment on May 13, 2011. This Order

17  is being issued shortly after the hearing date, in accordance with section 1855(f)(4).

**II.    LEGAL STANDARD**

19  This Court's review is governed by the Administrative Procedure Act. <u>Vt. Yankee</u>

20  <u>Nuclear Power Corp. v. Natural Res. Def. Council, Inc.</u>, 433 U.S. 519, 558 (1978); 16 U.S.C.

21  § 1855(f)(1); 5 U.S.C. § 706(2)(A)-(D). A court sets aside regulations if they are "arbitrary,

22  capricious, an abuse of discretion or otherwise not in accordance with law[.]" 5 U.S.C. §

23  706(2)(A). Summary judgment is an appropriate procedural mechanism "for deciding the

24  legal question of whether the agency could reasonably have found the facts as it did."

25  <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 770 (9th Cir. 1985). Under the arbitrary and

26  capricious standard, a reviewing court's job is "to determine whether the Secretary has

27

28      [9] This section provides that "[u]pon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way." <u>Id.</u>

7

**United States District Court**
For the Northern District of California

considered the relevant factors and articulated a rational connection between the facts found and the choices made." <u>Midwater Trawlers Coop v. Dep't of Commerce</u>, 282 F.3d 710, 716 (9th Cir. 2002) (citation omitted). This standard is deferential, presuming the agency action to be valid and affirming if there is a reasonable basis for the decision. <u>Ranchers Cattlemen Action Fund v. U.S. Dep't of Agric.</u>, 499 F.3d 1108, 1115 (9th Cir. 2007) (citations omitted). A court reviews the administrative record as a whole and decides whether the action is acceptable. <u>See</u> <u>Citizens to Pres. Overton Park v. Volpe</u>, 401 U.S. 402, 420 (1971); <u>Ranchers Cattlemen Action Fund</u>, 499 F.3d at 1115.

### III.    DISCUSSION

The following discussion proceeds in two major parts. First, the Court addresses Plaintiffs' MSA claims. Second, the Court addresses Plaintiffs' NEPA claims.

#### A.    The MSA Claims

Plaintiffs make three challenges to Amendments 20 and 21 under the MSA. First, that the MSA required the NMFS to allow fishing communities to participate in initial allocations of fishing quota, which the NMFS did not do. Second, that the MSA required the NMFS to impose a restriction on ownership of limited access privileges that the NMFS did not impose. Third, that the NMFS violated several of the MSA's National Standards applicable to all fishery management plans and amendments.

To the extent Plaintiffs are challenging the NMFS's interpretation of what the NMFS is required to do under the MSA, this Court undertakes a two-part task. First, the Court examines the statute to see if Congress's intent is clear. <u>Chevron U.S.A. v. Natural Res. Def. Council</u>, 467 U.S. 837, 842 (1984). Congressional intent may be determined by the plain language of the statute or, if that does not reveal Congressional intent, by use of standard statutory interpretation methods. <u>Calif. Wilderness Coal v. U.S. Dep't of Energy</u>, 631 F.3d 1072, 1085 (9th Cir. 2011). If Congressional intent is clear, the inquiry is over, and the Court must give effect to Congress's unambiguous directive. <u>Chevron</u>, 467 U.S. at 842-43. Second, if Congressional intent is ambiguous, a court asks "whether the agency's [interpretation] is based on a permissible construction of the statute." <u>Id.</u> That test is

**United States District Court**
For the Northern District of California

satisfied "if the agency's interpretation reflects a plausible construction of the statute's plain language and does not otherwise conflict with Congress' expressed intent."  Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1116 (9th Cir. 2006) (citation omitted).

### 1. The MSA Does Not Mandate Direct Participation of Fishing Communities In Initial Allocations Of Quota Under A LAPP

Plaintiffs argue that "[t]he statutory text of the 2006 MSA Amendments makes clear that NMFS and the Council were <u>required</u> to establish a process to enable the direct participation of fishing communities in initial allocations of fishing quota under their trawl rationalization IFQ program."  Pls.' Reply (dkt. 84) at 2 (emphasis added).  Plaintiffs base this argument on 16 U.S.C. §§ 1853a(a), (c)(3) and (5), which apply to LAPPs.  Plaintiffs' argument is unpersuasive.

### a. The MSA's Plain Language Does Not Support Plaintiffs' Interpretation

To determine Congressional intent, a court starts with the language of the statute:.

> (a) In general
> [A] Council may submit, and the Secretary may approve, for a fishery that is managed under a limited access system, a limited access privilege program to harvest fish if the program meets the requirements of this section.
> . . . .
>
> (c) Requirements for limited access privileges
> (3) Fishing communities
>
>     (A) In general
>
>         (i) Eligibility
>             To be eligible to participate in a limited access privilege program to harvest fish, a fishing community shall–
>
> [meet certain requirements, including those developed by the relevant Council]
>
>     (B) Participation criteria
>        In developing participation criteria for eligible communities under this paragraph, a Council shall consider–
>
>         (i) traditional fishing or processing practices in, and dependence on, the fishery;
>
>         (ii) the cultural and social framework relevant to the fishery;
>
>         (iii) economic barriers to access to fishery;

9

(iv) the existence and severity of projected economic and social impacts associated with implementation of limited access privilege programs on harvesters, captains, crew, processors, and other businesses substantially dependent upon the fishery in the region or subregion;

(v) the expected effectiveness, operational transparency, and equitability of the community sustainability plan; and

(vi) the potential for improving economic conditions in remote coastal communities lacking resources to participate in harvesting or processing activities in the fishery.

. . . .

(5) Allocation
In developing a limited access privilege program to harvest fish a Council or the Secretary shall–

(A) establish procedures to ensure fair and equitable initial allocations, including consideration of–

(i) current and historical harvests;

(ii) employment in the harvesting and processing sectors;

(iii) investments in, and dependence upon, the fishery; and

(iv) the current and historical participation of fishing communities;

(B) consider the basic cultural and social framework of the fishery, especially through–

(i) the development of policies to promote the sustained participation of small owner-operated fishing vessels and fishing communities that depend on the fisheries, including regional or port-specific landing or delivery requirements; and

(ii) procedures to address concerns over excessive geographic or other consolidation in the harvesting or processing sectors of the fishery;

(C) include measures to assist, when necessary and appropriate, entry-level and small vessel owner-operators, captains, crew, and fishing communities through set-asides of harvesting allocations, including providing privileges, which may include set-asides or allocations of harvesting privileges, or economic assistance in the purchase of limited access privileges;

. . . .

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> (E) authorize limited access privileges to harvest fish to be held, acquired, used by, or issued under the system to persons who substantially participate in the fishery, including in a specific sector of such fishery, as specified by the Council.

16 U.S.C. § 1853a.

The problem with Plaintiffs' argument is that the statute does not say that fishing communities <u>must</u> be assigned initial quota or even that they must be made eligible to participate in the initial quota allocation process.  Instead, the statute sets forth requirements for fishing communities "[t]o be eligible" and provides how the NMFS must go about "developing participation criteria for eligible communities[.]"  16 U.S.C. §§ 1853a(c)(3)(A)(i), (B).

Nor does the allocation section in 1853a(c)(5) show that the provisions regarding eligibility of fishing communities to participate in allocation are mandatory rather than permissive.  The allocation provision provides that a Council "shall" (1) "establish procedures to ensure fair and equitable initial allocation";  (2) "consider the basic cultural and social framework of the fishery"; and (3) "include measures to assist, when necessary and appropriate, . . . fishing communities through set-asides of harvesting allocations, including providing privileges, which may include set-asides or allocations of harvesting privileges, or economic assistance in the purchase of limited access privileges" when "developing a limited access privilege program[.]"  <u>Id.</u> § 1853a(c)(5)(A), (B), (C).  None of these requirements mandates that fishing communities receive an allocation of Quota Share or even be made eligible to do so.  They merely provide a process by which a Council must consider how allocation should be made and how fishing communities can be a part of that process "when necessary and appropriate."

Plaintiffs argue that subsection (c)(5)(B) shows that Congress meant for the Council to have "to adopt and implement measures as part of their trawl IFQ Program to address program impacts on fishing communities, their economic health and sustainability."  Pls.' Reply (dkt. 84) at 4.  Subsection (c)(5)(B) provides that a Council must "consider the basic cultural and social framework of the fishery, <u>especially through</u> – (i) the development of policies to promote the sustained participation of . . . fishing communities that depend on the

11

United States District Court
For the Northern District of California

1    fisheries, including regional or port-specific landing or delivery requirements[.]"  Id. §

2    1853a(c)(5)(B)(i) (emphasis added).  Even assuming *arguendo* that subsection (c)(5)(B)(i)

3    requires "the development of policies to promote the sustained participation of . . . fishing

4    communities[,]" it does not specify what those policies must be (outside of a suggestion that

5    they include regional and port-specific landing or delivery requirements) and does not

6    require that fishing communities be eligible to and actually receive quota share.

7         Thus, the plain language of the MSA does not support Plaintiffs' argument that the

8    NMFS and the Council were required to establish a process to enable direct participation by

9    fishing communities in initial quota allocation.

10                    **b.      The Legislative History Does Not Support Plaintiffs'
                            Interpretation**

11

12         Plaintiffs argue that the legislative history shows that Congress "intended for

     communities to participate in IFQ allocations if they meet the criteria developed by the
13
     Council."  Pls.' Reply (dkt. 84) at 2-3.
14

15              The bill also requires limited access privilege programs, such as
                individual fishing quota systems, established in the future not
16              only to contribute to a reduction of capacity in overcapitalized
                fisheries and improve fishermen's safety by ending the race for
17              the fish but also to <u>consider</u> social and economic benefits to
                coastal communities.  Senator Stevens' and my intent was to
18              sustain thriving fishing communities and promote access to the
                fisheries by residents of our coastal communities in order to
19              foster the independent, coastal community-based character of
                our Nation's fisheries.  To achieve this aim, the bill sets forth a
20              strong list of standards to ensure that any such program <u>take into
                account the social and economic implications of the program</u>.

21
     H223:*10; 152 Cong. Rec. S. 11701, *11700 (Dec. 8, 2006 Statement by Senator Daniel K.
22
     Inouye) (emphasis added).  Even assuming legislative history is necessary to divine
23
     Congressional intent in this instance – and in the Court's view it is not – Senator Inouye's
24
     statement does not say anything about allocation to fishing communities being required in
25
     every LAPP.  Rather, consistent with what the statute says, Senator Inouye contemplated that
26
     councils would "consider" social and economic impacts of LAPPs and "take into account"
27
     those impacts in some way.
28
                                         * * *

                                           12

At most, Plaintiffs have shown that the MSA is ambiguous as to whether the NMFS was required to allow fishing communities to participate directly in initial quota allocation, and the NMFS's determination that fishing communities were not required to be eligible to receive initial quota allocation is "a plausible construction of the statute's plain language and does not otherwise conflict with Congress' expressed intent." Or. Trollers Ass'n, 452 F.3d at 1116 (quoting Rust v. Sullivan, 500 U.S. 173, 183 (1991). Thus, the NMFS's interpretation is entitled to deference.

### c.  The NMFS Complied With The MSA's Requirements Regarding Fishing Communities

Amendment 20 has provisions that are designed, at least in part, to promote the sustained participation of fishing communities.[10]  Most notably, Amendment 20 held back 10% of Quota Share as part of the AMP "to respond to unintended consequences[,]" including negative community impact.  H555:51; B22:58-59 ("[T]he Council developed other mechanisms to address concerns about communities, including, but not limited to, the AMP, a two-year moratorium on QS transfers, a five-year review that includes a community advisory committee, accumulation limits and a two-year review of some of the limits, the opportunity for communities to receive an initial QS allocation by acquiring a trawl permit, and a trailing action on [Community Fishing Associations].").  B22:A-266-67; B22:A-139-40; B22:A-340; B22:58-59, A-283; A-391.  In addition, the record supports that other policies were adopted, at least in part, for their community protection function.[11]

---

[10] Plaintiffs do not dispute that the Council engaged in "an extended record of examination and re-examination of fishing communities and their potential participation." Pls.' Reply (dkt. 84) at 5. Instead, Plaintiffs take issue with the outcome (or perceived lack thereof) of the examination and re-examination of fishing communities and their potential participation.

[11]  For example, the maintenance of a split between the at-sea and shoreside trawl sectors protects communities because it forces trawlers to return to shore to process their catch. B22:A-25-26; B1:*291-92; B22:109-111.

Plaintiffs argue that the record does not support the conclusion that any of the foregoing, or the AMP, were "particularly intended to benefit fishing communities[.]" Pls.' Reply (dkt. 84) at 10. But nothing in 1853a(c)(5)(B) requires that the "policies to promote the sustained participation of . . . fishing communities" be "particularly intended" for that purpose above all other purposes that might also support a particular provision in a LAPP.

13

In sum, the NMFS and the Council complied with the MSA's provisions regarding fishing communities.

### 2. The NMFS Did Not Violate The MSA's Requirements On Eligibility To Own And Transfer A Limited Access Privilege

Plaintiffs also challenge the NMFS's interpretation of the requirements regarding who can own limited access privileges. Specifically, in Plaintiffs' view, "[o]nly persons who substantially participate in the fishery may receive IFQs through transfer" but "[t]he Pacific [Council] failed to include this eligibility limitation in the IFQ Program." Pls.' Mot for Summ J. (Dkt. 71) at 25. This argument is not compelling.

#### a. The MSA's Plain Language Does Not Support Plaintiffs' Interpretation

(1) In general. – Any limited access privilege program . . . under this section shall –

. . . .

    (D) prohibit any person other than a United States citizen [and other individuals and entities sufficiently associated with the United States] that meets the eligibility requirements established in the program from acquiring a privilege to harvest fish, including any person that acquires a limited access privilege solely for the purpose of perfecting or realizing on a security interest in such privilege.

. . . .

(5) Allocation. – In developing a limited access privilege program . . . a Council or Secretary shall –

. . . .

    (E) authorize limited access privileges . . . to be held, acquired, used by, or issued under the system to persons who substantially participate in the fishery . . . .

. . . .

(7) Transferability. – In establishing a limited access privilege program, a Council shall –

    (A) establish a policy and criteria for the transferability of limited access privileges (through sale or lease), that is consistent with the policies adopted by the Council for the fishery under paragraph (5).

16 U.S.C. §§ 1853a(c)(1)(D), 5(E), 7(A).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The most logical reading of this language is that Congress intended to require "persons who substantially participate in the fishery" to be "authorized" to obtain limited access privileges through initial allocation or transfer (i.e. substantial participants in the fishery cannot be <u>excluded</u> from limited access privileges either initially or after the program is up and running).  The statutory language does not show an intent to require that <u>only</u> those who "substantially participate in the fishery" be permitted to obtain limited access privileges. If Congress had intended that restriction it would have been easy enough to say so clearly.

Plaintiffs look for support for their preferred reading as to who can obtain limited access privileges in section (c)(1)(D), which provides that United States citizens "that meet[] the eligibility and participation requirements established in the program[,]" are entitled to obtain limited access privileges.  Plaintiffs reason from this that Congress must have meant that a Council was required to establish such "eligibility and participation requirements" beyond those already in the MSA.  Pls.' Reply (dkt. 84) at 13.  But Plaintiffs are grafting a requirement for agency action onto an authorization for agency action.

Therefore, the plain language of the MSA does not support Plaintiffs' interpretation.

### b.     The Legislative History Does Not Support Plaintiffs' Interpretation

First, Plaintiffs claim that MSA's legislative history shows that Congress intended only substantial participants in the fishery to be able to obtain limited access privileges. Specifically, Plaintiffs point to a Senate Report providing that 16 U.S.C. § 1853a(c)(7) (Transferability) "restricts the holding, acquisition, use, or issuance of LAPPs only to persons who substantially participate in a fishery."  Pls.' Mot. for Summ. J. (Dkt. 71) at 27 (quoting S. Rep. No. 109-229 at 26).

On its face, this appears to support Plaintiffs' preferred position as to restrictions on who can obtain (either through initial allocation or transfer) limited access privileges.  A closer look, however, suggests that Congress was concerned not with preventing non-participants obtaining limited access privileges but rather with anyone obtaining a limited access privilege without intending to use it.  <u>Id.</u> ("LAPPs are not intended to be used as a mechanism to reduce harvests through refinement of catch quota by those who are not fishery

15

**United States District Court**
For the Northern District of California

1   participants."). This makes sense because if an environmental or other interest group

2   acquired a limited access privilege and then did not use its quota to catch any fish, the result

3   would be a *de facto* reduction in the size of the available catch and an impediment to

4   achieving optimum yield. But that "use it or lose it" concern reflected in the legislative

5   history does not require reading the MSA to prohibit anyone not currently participating in the

6   fishery from obtaining a limited access privilege. Nor does it suggest that Congress intended

7   to prohibit non-participants from entering the fishery.

8       But even granting Plaintiffs their preferred reading of this legislative history, the

9   variance between it and the actual wording of the statute is significant. The legislative

10  history contains the word "only" in discussing the restriction as to those authorized to obtain

11  limited access privileges, but the MSA does not. This Court, of course, must follow the

12  language of the statute.

13              **3.       Amendments 20 And 21 Comply With The National Standards**

14      Fishery management plans must be consistent with ten National Standards. 16 U.S.C.

15  § 1851(a)(1)-(10). The NMFS is permitted to balance these standards against one another.

16  See Conservation Law Found. v. Mineta, 131 F. Supp. 2d 19, 27 (D.D.C. 2001). The

17  primary rhetorical thrust of Plaintiffs' National Standards challenge is that Federal

18  Defendants ignored trawling's negative impact on the fishery and senselessly ensured that

19  trawling will dominate the fishery for years to come.

20      In the Court's view, Federal Defendants acted consistently with the National

21  Standards and permissibly balanced the Standards' sometimes competing purposes against

22  one another.

23                          **a.       National Standard 1**

24      National Standard One provides as follows: "Conservation and management measures

25  shall prevent overfishing while achieving, on a continuing basis, the optimum yield from

26  each fishery[.]" Plaintiffs argue that the IFQ Program in Amendment 20 is inconsistent with

27  this standard because it "lacks capacity to prevent continued mortality of overfished stocks,

28

1    even if annual harvest limits could otherwise be achieved with observer monitoring."  Pls.'

2    Reply (dkt. 84) at 18.  This argument is unpersuasive.

3           Amendment 20 addresses overfishing and bycatch reduction in several ways.  Most

4    notably, rationalization will likely result in fleet consolidation, which means fewer trawl

5    vessels operating in the fishery (precisely what Plaintiffs appear to want).  Further, as noted

6    by the NMFS:

7           The alternatives for rationalization of the trawl fishery would
            support efforts to achieve OY and prevent overfishing. [They]
8           would increase individual accountability for total catch,
            including bycatch, and would give fishermen greater discretion
9           as to when and how to fish.  This would be expected to provide
            greater opportunity to extract the full OY of higher biomass
10          species while avoiding lower biomass species.  The 100 percent
            monitoring and increased accountability should reduce the risk
11          of overfishing.

12   B22:610.  The foregoing, and the record on the whole, supports the NMFS's conclusion that

13   Amendment 20's trawl rationalization program is consistent with National Standard 1.[12]

14          **b.    National Standard 2**

15          National Standard 2 provides as follows: "Conservation and management measures

16   shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).

17   "National Standard 2 does not compel specific analytical methods, nor does it require the

18   agency to collect all possible data before acting."  <u>Fishing Co. of Ala. v. U.S.</u>, 195 F. Supp.

19   2d 1239, 1248 (W.D. Wash. 2002) (citations omitted).  Instead, it requires that regulations

20   "be based on concrete analysis that permits the Secretary to 'rationally conclude that his

21

22

23          [12] Plaintiffs suggest that 100 percent monitoring to reduce bycatch provides an illusory
     conservation benefit because it requires federal funding that has not been allocated.  Pls.' Mot. for
24   Summ. J. (dkt. 71) at 31.  But Amendment 20 does not condition the monitoring program on a source
     of federal funds.  Rather, fishermen are required to procure observers themselves, and that obligation
25   does not dissolve even if the federal funding to support the acquisition of observers never materializes.
     B22:8 ("[T]he fishery would be subject to 100 percent observer coverage, allowing accurate accounting
26   of bycatch in addition to landings."); D45:6 ("<u>Subject to appropriations</u>, NMFS intends to pay up to
     90% of the costs [for monitoring] in the first year, with subsequent funding being phased out until 2014,
27   when participants are expected to bear the costs for monitoring in full.") (emphasis added); C21:*8
     ("NMFS has recognized the increased costs to the industry [of 100% monitoring] and is therefore
28   <u>planning</u> to subsidize the cost of observer coverage for at least the first year, <u>subject to appropriations</u>
     . . . .") (emphasis added).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

approach would accomplish his legitimate objective.'" Id. (quoting Parravano v. Babbitt, 837 F. Supp. 1034, 1047 (N.D. Cal. 1993)).

Plaintiffs' challenge (apparently to both Amendments 20 and 21) focuses on the destructive impact of trawling on the fishery and Amendment 20's and Amendment 21's combined effect of ensuring trawling's continued dominance going forward. Pls.' Mot. for Summ. J. (dkt. 71) at 33-34; Pls.' Reply (dkt. 84) at 19-21.

Plaintiffs' argument has facial appeal largely because it treats Amendments 20 and 21 as having emerged from a blank slate (i.e., the status quo FMP plays a minor role in Plaintiffs' analysis). But, as Federal Defendants stress, the reality is that Amendments 20 and 21 were grafted onto an FMP where trawling is not only permissible but predominant. In the Court's view, the Amendments' compliance with any National Standard (including the one requiring that they be based on the best scientific information available) must be assessed in the context of what the Amendments are doing to the existing FMP. In that context, Amendments 20 and 21 satisfy National Standard 2 because the NMFS's decisions were "based on concrete analysis that permit[ed] the Secretary to 'rationally conclude that his approach would accomplish his legitimate objective.'" Fishing Co. of Ala., 195 F. Supp. 2d at 1248 (citations omitted).

Amendment 20 rationalizes the trawl fishery and provides for 100% monitoring. Amendment 21 sets forth intersector allocations based on historical catch rates. The issue before the Council and the NMFS in Amendments 20 and 21 was not whether to allow trawling. Trawling is by far the major source of catch under the status quo FMP and, in the Council's view, is the only gear type capable of achieving optimum yield at this point. B22:50 ("[T]rawl gear is the only gear that can viably harvest much of the groundfish that is economically important to the fishery and important as a protein source to the broader public; i.e., it is the only gear that can be effectively used to remove much of the biomass that is available for harvest within conservation constraints."). The Council and the NMFS were not required to act as if trawling is not the dominant means of catching fish under the status quo to comply with National Standard 2. Moreover, Amendments 20 and 21 are designed, at

least in part, to <u>reduce</u> some of trawling's negative effects through fleet consolidation and

100% monitoring.  <u>See generally</u> B22:213-51; B22:596-603.[13]

Further, the Council did consider scientific evidence on the impact of trawl fishing on

the fishery and rejected as insufficiently probative certain scientific evidence favoring fixed

gear.  B22:601 ("Status quo [] management has shown that closed areas have contributed to

the reduction of bycatch of overfished rockfish species, and the benefits of those closed areas

would be expected to continue under rationalization."); B23:59 ("The proposed action to

make formal allocations of specified groundfish species and Pacific halibut . . . and set-asides

. . . to LE trawl sectors of the west coast groundfish fishery neither affects overall harvest

levels of any species, nor does it affect management measures for any sector of the fishery."

"The intersector allocation alternatives . . . are not expected to change the magnitude or

distribution of bottom trawl effort compared to the No Action Alternative.  However, the

related action, Amendment 20 (trawl rationalization), may result in geographic changes in

harvest patterns, and consequently, the potential for changes in impacts of EFH as described

in the EIS for that action.  Under both trawl rationalization (Amendment 20) and intersector

allocation (Amendment 21), no change in fishing activity would occur in areas that are

currently closed to fishing with specific gears . . . ."); B23:196-97 ("Although, in general,

NMFS noted that trawl gear does have greater impacts than fixed gear for a given habitat

type, if allocation changes lead to greater effort by fixed gear in currently untrawled,

biogenic habitats, overall impacts to habitat may actually increase.  . . . .  In conclusion,

while NMFS believes that using allocation to promote conservative shows promise, 'it would

be premature to make a long-term allocation decision' based on this factor alone.  Instead,

---

[13] Plaintiffs challenge the assertion that fleet consolidation via rationalization will result in less environmental impact from trawling by saying that "the EIS explains that the IFQ Program is expected to provide greater opportunity to extract the full OY of higher biomass species.  In other words, increased efficiency will lead to increased effort."  Pls.' Reply (dkt. 84) at 21 n.18.  Fleet consolidation will result in fewer trawl vessels operating in the fishery.  With quota share (and corresponding quota pounds) guaranteed and 100% monitoring in place, a trawler operating in the fleet after rationalization has less competition for fish (consolidation) and a strong incentive to reduce bycatch that will count against his quota.  The combination of these two program components (allocated quota and monitoring) thus reduces fleet size (and trawling impact) and encourages fishing practices designed to bring in target species rather than bycatch.

19

1   NMFS proposed further research in this area, ideally concluding in time to inform the

2   Council and NMFS at the 5-year review of the trawl rationalization program . . . . . . . .

3   Overall, little scientific information on the comparative effects of different fishing gears

4   currently exists.").

5          In addition, the NMFS specifically addressed, for example, the National Research

6   Council Report upon which Plaintiffs place significant import and explained why it did not

7   change the NMFS's analysis.  Pls.' Mot. for Summ. J. (dkt. 71) at 33.  The NMFS noted that

8   "[t]he National Research Council (2002) report is perhaps the most thorough report

9   referenced in the comment and states that bottom trawling on the Pacific coast is relatively

10  light compared to other regions of United States."  B23:197.  The EIS concludes that, "[o]n

11  balance, the science supports NMFS's position that more research is needed prior to making

12  an allocation decision between gear types to reduce bycatch or habitat impacts."  Id.

13         In sum, Amendments 20 and 21 were "based upon the best scientific information

14  available" in light of their purpose and their effect on the existing FMP.

15                          **c.      National Standard 4**

16  National Standard 4 provides in part:

17          If it becomes necessary to allocate or assign fishing privileges
            among various United States fishermen, such allocation shall be
18          (A) fair and equitable to all such fishermen; (B) reasonably
            calculated to promote conservation; and (C) carried out in such
19          manner that no particular individual, corporation, or other entity
            acquires an excessive share of such privileges.
20
21  16 U.S.C. § 1851(a)(4).  "The Secretary is allowed . . . to sacrifice the interests of some

22  groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole."

23  Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir. 1996) (citation omitted); 50

24  C.F.R. § 600.325(c)(3)(i)(B).

25         Plaintiffs' argument appears to be that trawl rationalization's principal purpose is to

26  promote economic efficiency, and any conservation gains are secondary to that purpose.

27  Pls.' Reply (dkt. 84) at 22 ("[P]laintiffs in this case maintain that the IFQ Program is not

28  reasonably calculated to promote conservation, that measures which could have increased the

                                            20

United States District Court
For the Northern District of California

1    Program's conservation quotient were rejected, and that any conservation gains from the

2    Program as it now stands are conjectural at best.").

3          Plaintiffs fail to show how Amendment 20 is not "reasonably calculated to promote

4    conservation" or is not "fair and equitable" to trawlers subject to the IFQ Program.  For

5    example, with respect to conservation, the Amendment 20 EIS provides that:

6          The proposed action is intended, in part, to reduce bycatch and
           improve total catch accounting.  Some important components of
7          the trawl rationalization program that will promote conservation
           are (1) 100 percent observer coverage and dockside monitoring .
8          . ., (2) increased individual accountability . . . reduc[ing] the risk
           of OY overages, (3) increased target catches and minimized
9          bycatch, (4) reduced number of active fishing vessels and
           increased operating efficiency may reduce gear and habitat or
10         protected species interactions, and (5) allowing trawlers to
           switch to longline or pot gear may reduce some habitat impacts.

11   B22:611.  Based on the administrative record, the NMFS's determinations about Amendment

12   20's "reasonable" likelihood of promoting conservation are supported.  Nor has the method

13   of distribution of limited access privileges among the fishermen been shown to be unfair or

14   inequitable.

15         National Standard 4 requires only that a measure be reasonably calculated to promote

16   conservation.  It does not say that promoting economic efficiency is an impermissible goal,

17   provided, as here, that a measure that promotes economic efficiency also is "reasonably

18   calculated" to promote conservation.

19                         d.    National Standard 5

20         National Standard 5 provides as follows: "Conservation and management measures

21   shall, where practicable, consider efficiency in the utilization of fishery resources; except that

22   no such measure shall have economic allocation as its sole purpose."  16 U.S.C. §

23   1851(a)(5).  Amendments 20 and 21 are the sort of management measures anticipated by

24   National Standard 5.  It is undisputed that economic efficiency is a goal of the trawl

25   rationalization program in Amendment 20.  But, contrary to Plaintiffs' argument, the record

26   does not support the conclusion that economic efficiency is the "sole purpose" of trawl

27   rationalization.  See Gen. Category Scallop Fishermen v. Sec'y of Commerce, 635 F.3d 106,

28

21

**United States District Court**
For the Northern District of California

1  116 (3d Cir. 2011) ("To prevail on this claim, the fishermen are required to show that the

2  Secretary failed to consider <u>any</u> non-economic objectives . . . .") (citation omitted).

3      Plaintiffs argue that Section 1.3.1 of the Amendment 20 EIS shows an unceasing

4  focus on economic efficiency over all other purposes.  B22:6-8.  Not so.  First, by its own

5  terms Section 1.3.1 talks about conservation as well as economics.  For example, the EIS

6  says that "[l]imiting catch directly or indirectly may address stock conservation concerns <u>if</u>

7  <u>catches can be constrained to or below maximum sustainable yield (MSY)</u>; even so,

8  economic efficiency objectives are unlikely to be met."  B22:7 (emphasis added).  Put

9  differently, there are methods other than limited access programs that "<u>may</u> address stock

10  conservation concerns," but if they leave the fishery economially disfunctional, then the

11  public resource is unlikely to be utilized effectively.  Likewise, Section 1.3.1 further provides

12  that:

13          By itself, an IFQ program may have few direct conservation
          benefits, but substantial indirect benefits. . . . . [Program]
14          features [such as catch accountability and observer coverage] are
          expected to reduce or eliminate regulatory bycatch substantially
15          . . . which has been a big problem in the groundfish fishery as
          currently managed . . . .  If not adequately accounted for, this
16          bycatch contributes to excess mortality and misspecification of
          future OYs.  In addition, IFQs can motivate fishermen to avoid
17          stocks with low harvest limits . . . because scarcity value drives
          up share prices for these stocks. . . . .  It could also be argued
18          that an IFQ program, because of share value to yield, would
          stimulate a conservative ethic among fishermen . . . .

19

20  B22:8.  Second, the Section preceding Section 1.3.1 (Section 1.2.3) provides a listing of 8

21  program "objectives."  B22:6.  Among the non-economic objectives are (1) providing a

22  mechanism for total catch accounting; (2) promoting practices that reduce bycatch and

23  discard mortality and minimize ecological impacts; and (3) increasing safety in the fishery.

24  The record supports that these objectives were a meaningful part of the purpose of the trawl

25  rationalization program, such that Plaintiffs cannot show that Amendment 20's "sole

26  purpose" was "economic allocation."

        **e.      National Standard 8**

27  National Standard 8 provides as follows:

28

1
2
3
4
5

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

6   16 U.S.C. § 1851(a)(8).[14]  "About the best a court can do when it reviews the NMFS's

7   performance with respect to National Standard No. 8 is to ask whether the Secretary has

8   examined the impact of, and alternatives to, the plan he ultimately adopts . . . ."  Or. Trollers

9   Ass'n, 452 F.3d at 1123 (citation omitted).

10          The parties diverge on two issues with respect to Standard 8.  First, whether it

11   mandates measures to (1) "provide for the sustained participation of [fishing communities]"

12   and (2) "minimize adverse economic impacts on such communities" "to the extent

13   practicable" or, instead, merely mandates that the importance of fishery resources to fishing

14   communities be "taken into account."  Pls.' Mot. for Summ. J. (dkt. 71) at 34; Federal Defs.'

15   Mot. for Summ. J. (dkt. 81) at 43.  Second, they dispute whether, assuming that National

16   Standard 8 mandates measures to provide for the sustained participation of fishing

17   communities and minimize adverse economic impacts on such communities, the NMFS has

18   met its obligations.

19          The first issue raises a question of statutory interpretation.  The plain language of

20   National Standard 8 requires the NMFS to do more than merely "take into account the

21   importance of the fishery resources to fishing communities" (something the NMFS and the

22

23          [14] "Fishing community" is defined as follows:

24          a community that is substantially dependent on or substantially engaged in the harvest or processing of fishery resources to meet social and economic needs, and includes fishing vessel owners, operators, and crew, and fish processors that are based in such communities. A fishing community is a social or economic group whose members reside in a specific location and share a common dependency on commercial, recreational, or subsistence fishing or on directly related fisheries-dependent services and industries (for example, boatyards, ice suppliers, tackle shops).

25
26
27

28   50 C.F.R. § 600.345(b)(3).

<div style="writing-mode: vertical">**United States District Court** For the Northern District of California</div>

1    Council undisputably did).[15]  Instead, the NMFS must "take into account the importance of

2    fishing resources to fishing communities . . . in order to (A) provide for the sustained

3    participation of such communities, and (B) to the extent practicable, minimize adverse

4    economic impacts on such communities."  16 U.S.C. § 1851(a)(8) (emphasis added).

5    Federal Defendants' construction of National Standard 8 essentially reads out the "in order

6    to" language, which the Court finds to be too strained a reading to the language to credit.

7         The question thus becomes whether Amendment 20 does enough to "provide for the

8    sustained participation of" fishing communities and "to the extent practicable, minimize

9    adverse economic impacts on such communities."  Balancing National Standard 8 with the

10   other National Standards, Amendment 20 contains just enough provisions to provide for the

11   sustained participation of fishing communities and to minimize adverse economic impacts to

12   pass muster.  Those provisions, discussed in more detail above, include (1) keeping a split

13   between the at-sea and shoreside trawl sectors; (2) broad eligibility for quota ownership; (3)

14   a moratorium on the transfer of Quota Share to ease transition; (4) vessel and owner limits to

15   spread Quota Share among a wider group; (5) a community advisory committee; and (6) the

16   AMP set-aside.  B22:58-59, A-38.  Although these measures might have been motivated in

17   part by concerns other than just promotion of fishing communities' sustained participation in

18   the fishery, National Standard 8 does not require that provisions to provide for the sustained

19   participation of fishing communities be designed exclusively for that reason.

20   //

21   //

22   //

23

24        [15] The Council and the NMFS "took into account" "the importance of fishing resources to
     fishing communities" in analyzing trawl rationalization. B22:61, 163-87, 219, 494-565 (the alternatives

25   examined "will tend to beneficially impact some communities, while adversely impacting others.  This
     compares with Alternative 1 (No Action) where most communities will continue to suffer.").  Further,

26   this analysis included program impacts on both trawl and non-trawl fishing communities.  C20:*21;
     B22:xx ("Non-trawl communities could be affected by rationalization through increased competition,

27   gear conflicts, impacts on the support sector, infrastructure impacts, and competition in the
     marketplace."); B22:402-409 (describing "[p]otential impacts [that] could result from potential spillover

28   effects from a rationalized trawl fishery" including, for example, "if non-trawl sectors rely on the
     presence of trawl harvesters to maintain the presence of processors and support businesses, the departure
     of trawl vessels from a port may have geographic consequences to non-trawl harvesters").

1

### f.      National Standard 9

National Standard 9 provides that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch."  16 U.S.C. § 1851(a)(9).

Plaintiffs argue that Amendments 20 and 21 fail this standard because they do not minimize bycatch or mortality of bycatch, at least as compared to their preferred alternative of less trawling and more fixed gear fishing.  Pls.' Reply (dkt. 84) at 25 ("The problem is that the design of the Program began with a decision to preserve the status quo prosecution of the fishery by trawl gear, and then rejected almost all of the Program design options and requirements provided by Congress and by NMFS itself to foster the long-term health of the fishery.").  Plaintiffs are incorrect.

Although trawl rationalization with 100% observer coverage might not reduce bycatch or bycatch mortality <u>as much</u> as other management measures incorporated into a rationalization program might have, National Standard 9 is nevertheless satisfied because Amendments 20 and 21 are reasonably likely to minimize bycatch among the trawl sector of the fishery.  B22:612 ("The rationalization alternatives are designed to improve total catch accounting and to reduce bycatch.  The alternative should reduce regulatory discards, increase target catches, and promote greater individual responsibility for avoiding bycatch."); B22:648 ("The analysis in the [draft] EIS supporting predictions that trawl rationalization will lead to reductions in the bycatch has a theoretical basis, informed by empirical evidence[.]"); B22:237 ("The reduction in bycatch of overfished species is expected to be a principal outcome of trawl rationalization."); <u>Ocean Conservancy v. Gutierrez</u>, 394 F. Supp. 2d 147, 159 (D.D.C. 2005) ("Although the NMFS <u>might</u> have done more to reduce bycatch, <u>'more'</u> is not the standard that NMFS must follow.").

### 4.      Amici's Arguments Are Not Properly Before The Court And, In Any Event, Are Without Merit

Amici Food and Water Watch raises two arguments that were not raised by Plaintiffs.  First, that Amendment 20 violates 16 U.S.C. § 1853a(c)(5)(B)(ii).  Second, that Amendment 20 violates the public trust doctrine.  "In the absence of exceptional circumstances, which

25

United States District Court
For the Northern District of California

1    are not present here, we do not address issues raised only in an amicus brief." Artichoke

2    Joe's Cal. Grand Casino v. Norton, 353 F.3d 712, 719 n.10 (9th Cir. 2003). Thus, Amici's

3    arguments are not properly before the Court.[16]

4            Even if the Court were to consider Amici's unique arguments, they are not

5    persuasive.

6            First, section (c)(5)(B)(ii) requires the Council and the NMFS "in developing a

7    limited access privilege program to harvest fish" to "consider the basic cultural and social

8    framework of the fishery, especially through – procedures to address concerns over

9    excessive geographic or other consolidation in the harvesting or processing sectors of the

10   fishery." As discussed above in the context of (c)(5)(B)(i), even assuming *arguendo* that

11   subsection (c)(5)(B)(ii) requires "procedures to address concerns over excessive geographic

12   or other consolidation in the harvesting or processing sectors of the fishery[,]" it does not

13   specify what those procedures must be. Various aspects of Amendment 20 – including, for

14   example, limitations on ownership of quota and the AMP – are designed to address

15   problems that might arise as a result of consolidation.

16           Second, the public trust doctrine was not violated here, even if it applies,[17] because

17   nothing in Amendment 20 creates a permanent right in favor of a private party to public

18   resources or substantially impairs any public right in the resource without public benefit.

19   //

20   //

21   //

22

23   _____

     [16] Plaintiffs claim that their opening brief addressed the public trust doctrine such that Amici's
     argument regarding the public trust doctrine is properly before the Court. Plaintiffs said in a footnote

24   of their opening brief that "Congress also has had the benefit of an extended discussion by the NRC of
     the applicability of the public trust doctrine to U.S. fisheries, including the issues of the inalienability
     of trust resources and the need to avoid creation of property rights in the resources. Pls.' Mot. for

25   Summ. J. (dkt. 71) at 28 n.33 (citing O78:39-45). This is not an argument that Amendments 20 and 21
     violated the public trust doctrine.

26

27   [17] Federal Defendants argue that the public trust doctrine does not apply because it was
     legislatively displaced by the MSA. See Am. Elec. Power Co. v. Conn., 131 S. Ct. 2527, 2537 ("We
     hold that the Clean Air Act and the EPA actions it authorizes displace any federal common law right

28   . . . ."). To the extent Congress has set forth the requirements for a valid LAPP, the public trust doctrine
     cannot supplant or supplement those requirements.

### 5.    Conclusion Re MSA Claims

The NMFS properly interpreted and met its obligations under the MSA and balanced the National Standards.  Accordingly, Federal Defendants are entitled to Summary Judgment on Plaintiffs' MSA claims.

### B.    NEPA Claims

### 1.    The NMFS Did Not Improperly Split The EIS Process In Two

"Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."  40 C.F.R. § 1502.4(a); Klamath-Siskiyou Wildlands Ctr. v. Bureua of Land Mgmt, 387 F.3d 989, 995 (9th Cir. 2000).  Plaintiffs argue that Federal Defendants violated this requirement by preparing an EIS for each Amendment rather than a consolidated EIS.  Pls.' Mot. for Summ. J. (dkt. 71) at 39.

To determine whether proposals are "in effect[] a single course of action[,]" the Ninth Circuit applies the "independent utility test[.]"  Great Basin Mine Watch v. Hankins, 456 F.3d 955, 969 (9th Cir. 2000).  The independent utility test is satisfied, and two separate EISs are appropriate, "[w]hen one of the projects might reasonably have been completed without the existence of the other . . . ."  Id. (citing Native Ecosystems Council v. Dombeck, 304 F.3d 886, 894 (9th Cir. 2004)).  Thus, actions are sufficiently independent if "each could exist without the other, although each would benefit from the other's presence."  Nw. Res. Info. Ctr. V. NMFS, 56 F.3d 1060, 1068 (9th Cir. 1995) (citation omitted); see also Wetlands Action Network v. U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1118 (9th Cir. 2000) (actions do not require a single EIS if it "would not be unwise or irrational to undertake" one in the absence of the other).

Applying the above standards, the NMFS was justified in breaking down the EIS process into two separate segments.  This is because, although Amendment 20 and

1    Amendment 21 each benefit from the other's presence and they were intended to emerge

2    together as coordinated actions,[18] each has "independent utility."

3            That these Amendments have "independent utility" is revealed by examining what

4    each Amendment does.  Amendment 20 is a trawl rationalization program.  It was a step the

5    Council and the NMFS could take without also changing how catch is allocated <u>between</u> the

6    trawl and non-trawl sectors of the fishery.  Amendment 21 deals with intersector allocation,

7    and was a step the Council and NMFS could take without rationalizing the trawl fleet.

8    B22:683 ("The purpose and need for Amendment 21, as described in that EIS, identifies

9    support of trawl rationalization as <u>one of three purposes</u> for establishing the allocation

10   scheme, the other two being to streamline the biennial harvest specifications process and to

11   address bycatch of Pacific halibut.") (emphasis added); B22:87 ("[F]ixed percentages have

12   to be established for [groundfish now implicitly allocated] as a precursor to assignment of

13   catch privileges envisioned under the trawl rationalization alternatives.  <u>Although such fixed</u>

14   <u>allocations could be adopted and modified periodically through the biennial specifications</u>

15   <u>process, the Council decided that it would simpler and perhaps ultimately less controversial</u>

16   <u>to establish permanent allocations by FMP amendment</u>.") (emphasis added); B22:682

17   ("Nowhere in either proposal is there a mechanism that triggers implementation of the other

18   action."; "If Amendment 21 were not implemented, the trawl fishery could still be managed

19   with IFQs and co-ops under Amendment 20.  While an allocation is required to determine

20   the conversion of QS to QP, such allocations could be determined and implemented through

21   the Council's biennial groundfish harvest specification process.  Although pre-established

22   allocations such as the trawl allocation in Amendment 21 could simplify the biennial

23

24            [18] Plaintiffs provide examples of the Council discussing the intertwined nature of Amendments
     20 and 21.  B23:58 ("intersector allocation (Amendment 21) is needed to support Amendment 20 (trawl
25   rationalization)"); B23:xiii, 4 (part of the "purpose and need" for Amendment 21 is to "support"
     Amendment 20); B23:49 (Amendment 20 EIS is "related" to Amendment 21 EIS); B23:160
26   ("Amendment 21 is critical for implementing Amendment 20 trawl rationalization . . . ."); B23:163
     ("The proposed Amendment 21 actions . . . are closely connected to the trawl rationalization program.")
27   ; D50:23 ("Both amendments are scheduled for simultaneous implementation."); B23:160 ("Since a
     primary objective of Amendment 21 is to support the trawl rationalization program, coincident reviews
28   of both the program and the supporting formal trawl allocations five years after implementing both
     amendments is sensible.").

process, it is not accurate that Amendment 20 cannot be implemented without them. Likewise, Amendment 21 can be implemented without implementing Amendment 20. If that were the case, the Council would continue to manage the groundfish trawl fishery with status quo measures (cumulative trip limits and whiting quotas/seasons). Furthermore, as mentioned previously, the biennial harvest specifications process benefits in any event from the allocations established in Amendment 21, because the amount of decision-making required is reduced."); B22:683 ("The rationale for Amendment 20 does not flow from the fact that allocations are established and similarly trawl rationalization is not justified by the allocations adopted under Amendment 21. Conversely, Amendment 21 is justified independent of Amendment 20, because, as stated above, it will help to simplify the biennial harvest specifications process no matter what measures are used to manage the groundfish trawl fishery.").

That it was appropriate for the NMFS to prepare two EISs is supported also by the fact that the harm sought to be avoided by requiring one EIS for related actions – "prevent[ing] an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact" – is not present here. Hankins, 456 F.3d at 969. Plaintiffs' concern is that the Council failed to justify (at least to Plaintiffs' satisfaction) trawling's continued predominance in the fishery, which in Plaintiffs' view these Amendments serve to perpetuate. But the failure to address trawling's continued domination of the fishery in more detail was not the function of preparing two EISs. Rather, it was the function of the Council's and the NMFS's view of the purpose and need for each Amendment in light of the existing FMP and trawling's place within it.

Thus, the record supports the NMFS's decision to treat Amendments 20 and 21 as separate for purposes of preparing EISs, and the agency's decision to do so was not arbitrary or capricious. See Native Ecosystems Council, 304 F.3d at 894 ("To prevail, Plaintiffs must show that the Forest Service was arbitrary and capricious in failing to prepare one comprehensive environmental statement.") (citation omitted).

United States District Court
For the Northern District of California

**2.      The Statements Of Purpose And Need Were Reasonable**

NEPA requires an agency to state the underlying purpose and need for a proposed action.  Nat. Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1069 (9th Cir. 2010).  Agencies have "considerable discretion" in defining the purpose and need for a project.  Friends of Se.'s Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998).  "Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS."  Westlands Water Dist. v. Dep't of Interior, 376 F.3d 853, 866 (9th Cir. 2004); Friends of Se.'s Future, 153 F.3d at 1066-67 (an agency's "statement of purposes is to be evaluated under a reasonableness standard.") (citations omitted).

Amendment 20's "fundamental purpose" was to "create and implement a capacity rationalization plan that increases net economic benefits, creates individual economic stability, provides for full utilization of the trawl sector allocation, considers environmental impacts, and achieves individual accountability of catch and bycatch."  B22:5.

Plaintiffs object to this statement of purpose in two primary ways.  First, Plaintiffs argue that it fails to track the language of 16 U.S.C. § 1853a, which authorizes LAPPs.  Second, Plaintiffs assert that the "statement of purpose and need narrows the Amendment 20 EIS to a trawl-based focus, even though nothing in the MSA establishes such a restriction."  Pls.' Mot. for Summ. J. (dkt. 71) at 41.  Neither of Plaintiffs' contentions has merit.

There is no requirement that an agency's statement of purpose track the language in the implementing statute verbatim.  It is true that an agency cannot define the objectives of its action in unreasonably narrow terms.  See Westlands Water Dist., 376 F.3d at 866.  But that did not occur here because the Council's expression of purpose does not foreordain the form the rationalization program would take.

In addition, the development of a trawl rationalization program is consistent with the MSA generally (LAPPs are expressly permitted) and supported by the current status of the fishery and the existing FMP.  As mentioned earlier, the Council determined that "trawl gear is the only gear that can viably harvest much of the groundfish that is economically

30

**United States District Court**
For the Northern District of California

1   important to the fishery and important as a protein source to the broader public; i.e., it is the

2   only gear that can be effectively used to remove much of the biomass that is available for

3   harvest within conservation constraints." B22:50.  That determination was not arbitrary or

4   capricious because it was "based on observations that, for most species and grounds . . . no

5   other fleet or gear type has developed to harvest the quantities of groundfish accessed by the

6   trawl fleet, <u>despite the absence of regulations which would prevent that from occurring</u>

7   <u>under the status quo</u>."  B22:657 (emphasis added).  Further, Congress expressly directed the

8   Council to "develop a proposal for the appropriate rationalization program for the Pacific

9   <u>trawl</u> groundfish and whiting fisheries, including the shore-based sector of the Pacific

10  whiting fishery under its jurisdiction."  Pub. L. 109-479, 120 Stat. 3575, 3624, Section

11  302(f) (emphasis added).[19]

12          In sum, the statements of purpose and need for Amendments 20 and 21 were not

13  impermissibly narrow.

### 3.      A Reasonable Range Of Alternatives Was Considered In The EISs For Amendments 20 And 21

15          An agency must set forth a reasonable range of alternatives to achieving a regulatory

16  goal and present this information to the public.  42 U.S.C. § 4332(C)(iii); 40 C.F.R. §§

17  1502.1, 1502.14, 1502.16.  "Indeed, the alternatives analysis section is the heart of the

18  environmental impact statement.  The agency must look at every reasonable alternative

19  within the range directed by the nature and scope of the proposal.  The existence of

20  reasonable but unexamined alternatives renders an EIS inadequate."  'Ilio'ulaokalani

21  <u>Coalition v. Rumsfeld</u>, 464 F.3d 1083, 1095 (9th Cir. 2006) (quoting <u>Friends of Se.'s</u>

22  <u>Future</u>, 153 F.3d at 1065).  The alternatives considered must be distinguishable enough from

23  each other to allow for "a real, informed choice."  <u>Friends of Yosemite Valley v.</u>

---

[19] Plaintiffs do not really challenge Amendment 21's statement of purpose, other than to again argue that it was improper for the Council to have a "trawl focus" because it "begs the question of whether it was appropriate to freeze fixed gear into its current relative share and limit the ability of fixed-gear participants to increase the use of this environmentally preferable technology."  Pls.' Reply (dkt. 84) at 32 n.30.  But this argument is really about consideration of alternatives to using historical catch to set long-term intersector allocations rather than a challenge to the statement of purpose and need in Amendment 21.

Kempthorne, 520 F.3d 1024, 1038-39 (9th Cir. 2008); Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1218 (9th Cir. 2008).  A court reviews an EIS's range of alternatives under the "rule of reason."  Westlands Water Dist., 376 F.3d at 868 (citation omitted).  NEPA does not mandate consideration of alternatives "whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative."  Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1180 (9th Cir. 1990) (citation omitted).

### a.    The Range of Alternatives Considered In Amendment 20 Was Reasonable

Plaintiffs challenge the range of alternatives considered in connection with Amendment 20 because the only alternative considered was an IFQ program. Pls.' Mot. for Summ. J. (dkt. 71) at 44; Pls.' Reply (dkt. 84) at 32 ("[T]he Amendment 20 EIS's consideration of *no* alternatives to an IFQ for the non-whiting sector was unreasonable.").

Obviously, a set of alternatives that all involve an IFQ program are similar to each other in that important respect.  Federal Defendants argue that because the Council concluded "[o]ver the course of formulating proposals to reach [the] goal [of implementing a capacity rationalization plan that] trawl rationalization was . . the single most effective means of moving the fishery toward its most important goals and objectives[,]" it did not need to formally include non-IFQ program alternatives in the Amendment 20 EIS.  D49:16-17; Federal Defendants' Mot. for Summ. J. (dkt. 81) at 61.

The NMFS did enough under NEPA to satisfy its statutory obligations to consider alternatives that would actually achieve its goals and explain why other alternatives not addressed more formally were rejected.

For example, the Council considered and rejected, among other things, the following alternatives:

- A "cap-rent-recycle model" "because (1) auctioning quota at the outset of the program could make it more difficult for the groundfish trawl fleet to successfully transition to IFQ/co-op management, and (2) exclusion of auctions from the range of alternative does not imply that access privileges

have been irrevocably distributed."  B22:650; 654 ("One concern about using an auction for initial allocation was its potentially disruptive effects, particularly with respect to smaller, less well-financed harvesting operations."); B22:*1455, A-417.

• "[A]llocating individual fishing quotas (IFQs) for a fixed term and then auctioning off a portion of the quota[,]," because, in part, of several "limitations," including that "[s]mall fishing companies may not have access to the finance or subsidies that larger entities have access to, handicapping them in auctions.  Arrangements that favor smaller companies distort the auction market and may lead to lower rents being generated or a smaller proportion of the rents being collected."  B22:649-50; B22:F-1, F-12.  Further, "[a]n initial auction is not proposed because of the need for a transition during a period of economic stress.  It is unlikely that many of the participants in the current fishery have structured their operations financially in a manner that would allow them to effectively compete in an auction.").[20]  B22:A-417.

• A "mitigation alternative" proposed by Ecotrust because it was essentially directed at a different purpose – encouraging trawlers to shift to fixed gear – and the proposal to tie quota share to environmental performance "would add additional complexity" and would be "impractical[.]"  B22:651.

• An Optimum Species Harvesting Unified Allocation Plan ("OSHUA") because it was "beyond the scope of the proposed action, given that it considers the application of a catch privilege system to all groundfish fishery sectors.  . . . . [T]he Council concluded that the OSHUA measures addressing the groundfish trawl fishery alone were so complicated and contentious that

---

[20] Plaintiffs argue, among other things, that not including an auction alternative is problematic under NEPA because auctions were contemplated by Congress in 16 U.S.C. § 1853a(d).  It is true that section 1853a(d) requires a council to "consider" "an auction system or other program to collect royalties for the initial, or any subsequent, distribution of allocations in a limited access privilege program[.]"  But section 1853a(d) does not require a council to include this as a formal alternative to comply with NEPA.  The record reflects that the Council and the NMFS did "consider" an auction system and rejected it as unsuitable for the fishery in light of current economic conditions.

any expansion of scope to other sectors would have likely paralyzed the decision-making process." B22:652.

• A regional landing zone option, because the objectives of a regional area management option (preventing regional depletion of stock; distributing economic benefits; ensuring certain communities receive economic benefits) would be more precisely addressed by "[c]atch [and landing] area restrictions on IFQs[.]" B22:A-425.

• A gear-switching incentive option, which the Council "decided against [] based on its preliminary specifications. Additional guidance would have been needed to fully specify this gear conversion provision. Specifically, there was a question as to what would be constrained or converted to 'fixed-gear only' after the two-year period. . . . . [C]onstraint of the permit would be unlikely to achieve the purpose of the provision until enough permits had been converted to constrain the fleet's ability to use trawl gear to take the full amount of the available harvest. Until such time, QS could be moved from the converted trawl permits (trawl IFQ sector permits) to regular trawl permits, such that no permanent conversion to non-trawl gear is achieved. Constraint of the vessel would be even less likely to achieve the desired end because there are even more substitute vessels available than there are trawl permits. Requiring the conversion of all QS/QP used with the vessel would provide a substantial disincentive for a vessel to opt for conversion unless it was the vessel's intent to use only non-trawl gear. In addition to the constraint on the vessel's activities with full conversion of all a vessel's QS, the loss of flexibility to use those QS with trawl gear would reduce the market value of those QS. Partial conversion, requiring the conversion of only those QS representing the QP used with the converted gear, would substantially reduce the disincentive for participating in conversion at the end of the second year. . . . . Both the

United States District Court
For the Northern District of California

1    complete and partial QS conversion approaches could present tracking

2    problems with determining what QS would be converted."  B22:A-419-20.

3    •    Certain provisions for community fishing associations, which the Council felt

4    were best addressed in a trailing amendment because "[t]here was little

5    consensus on which communities were vulnerable, how to define

6    vulnerability, and what analysis could be completed before the final preferred

7    option would be selected . . . ."  B22:A-439.

8    See also e.g., B22:49-50 ("Some other approaches for rationalization that were considered

9    and set aside were permit stacking, processor QS, community development quotas (CDQs),

10   and a proposal called [OSHUA].  . . . .  The Council kept an option for permit stacking (and

11   switching from landing to catch limits) on the table for several years during its deliberative

12   process before finally setting it aside.  The main problem with the alternative was that it

13   entailed some of the more significant costs of the IFQ alternative (e.g. full observer

14   coverage) but without the flexibility needed to generate significant economic benefit from

15   rationalization.  . . . .  It is arguable whether or not processor shares are an effective or

16   needed tool for rationalization of the fishery.  The Council consideration of such an option

17   was stemmed first by a Congressional prohibition on the spending of funds for consideration

18   of quotas for processing and then by a prohibition in the MSA.  . . . .  The Council also

19   explored rationalization programs that might directly include communities [but] the Council

20   heard [that] local governments on the west coast were not interested in the administrative

21   costs and burdens that would be entailed in running [such a] program. . . . .  The OSHUA

22   plan . . . did not allow for substantial rationalization of the fishery and the generation of the

23   increased benefits needed to counteract the increased management costs."); H210:4 ("[T]he

24   suite of goals for the TIQ program would not be achieved under the permit stacking

25   alternative.").

26       The Council and the NMFS met their obligations regarding consideration of

27   alternatives, especially in light of this Court's obligation to defer to the Council's and

28   NMFS's technical expertise.  See 40 C.F.R. § 1502.14(a); see also Laguna Greenbelt, Inc. v.

United States District Court
For the Northern District of California

1   U.S. Dep't of Transp., 42 F.3d 517, 524 (9th Cir. 1994); Headwaters, Inc., 914 F.2d at 1180;

2   Westlands Water Dist., 376 F.3d at 871 ("'[I]t would turn NEPA on its head to interpret the

3   statute to require that [an agency] conduct in depth analyses of . . . alternatives that are

4   inconsistent with the [agency's] policy objective.'") (quoting Kootenai Tribe v. Veneman,

5   313 F.3d 1094, 1122 (9th Cir. 2002) (alternations in Westlands Water Dist.).

### b.  The Range Of Alternatives Considered In Amendment 21 Was Reasonable

Plaintiffs also complain that Amendment 21's range of alternatives was insufficient

because all intersector allocation alternatives were based on catch history.  Pls.' Reply (dkt.

84) at 33 ("[A] range excluding every factor other than catch history for Amendment 21 was

not reasonable . . . .").  It is unclear what other reasonable alternative allocation

methodologies could have been included but were rejected.

Plaintiffs note that the Council rejected a proposal that would shift allocations to

fixed gear by an absolute 25-30%, but the Council had ample reasons for doing so because

the impact of that allocation was speculative.  B23:194 ("NMFS believes that th[e] assertion

regarding the benefit of increases in non-trawl harvest is too simplistic, but will be further

explored by NMFS in the near future.  Nonetheless, . . . the proposed action under

Amendment 21 does not provide more bottom trawl opportunity than status quo

management measures and allocations.  In addition, the proposed action under Amendment

20 trawl rationalization allows limited entry trawl permit holders to switch from trawl to

fixed gears to fish their quota, which, in turn, would reduce trawl impacts.  It also allows

non-trawl vessels to harvest the allocation to the trawl sector if they acquire a trawl permit

and IFQ.  The proposed action under Amendment 21 also provides higher non-trawl

allocations for most of the affected species than under any of the other alternatives,

including the No Action Alternative, and higher non-trawl allocations than the historical

sector catch shares used to inform the intersector allocation alternatives.").  Further, the

Council determined that the lack of sufficiently reliable data on the differential impact of

gear types made it premature to make allocation decisions based on claimed environmental

benefits.  B23:196 ("Although, in general, NMFS noted that trawl gear does have greater

**United States District Court**
For the Northern District of California

1   impacts than fixed gear for a given habitat type, if allocation changes lead to greater effort

2   by fixed gear in currently untrawled, biogenic habitats, overall impacts to habitat may

3   actually increase."); D50:21 ("[S]ome commenters on the draft EIS contend that the use of

4   non-trawl gear has less environmental impact than trawl gear.  NMFS believes the evidence

5   for this contention is inconclusive and that further research is necessary to determine the

6   relative impacts of different gears that may be used to harvest Amendment 21 species.").

7   The Council's determination is entitled to deference, and the range of alternatives

8   considered for Amendment 21 satisfies the rule of reason.  See Westlands Water Dist., 376

9   F.3d at 872.

10                **4.       The EISs Took A Hard Look At Environmental Impacts**

11          An EIS "'shall succinctly describe the environment of the area(s) to be affected or

12   created by the alternatives under consideration.'"  Laguna Greenbelt, Inc., 42 F.3d at 528

13   (quoting 40 C.F.R. § 1502.15).  Courts employ the "rule of reason" to determine "whether

14   an EIS contains a 'reasonably thorough discussion of the significant aspects of probable

15   environmental consequences.'"  Or. Nat. Res. Council v. Lowe, 109 F.3d 521, 526 (9th Cir.

16   1997) (citation omitted).  In applying the rule of reason, a court asks "whether an EIS took a

17   'hard look' at the environmental impacts of a proposed action."  Nat. Parks & Conservation

18   Ass'n, 606 F.3d at 1072.

19          Plaintiffs assert that the EISs "focused primarily on the potential economic effects on

20   trawl sector participants, to the substantial exclusion of other important interests."  Pls.'

21   Reply (dkt. 84) at 36.  Specifically, Plaintiffs argue that the EISs did not adequately address

22   (1) consideration of the effects on non-trawl communities; (2) the scientific evidence

23   regarding the comparative environmental advantages of non-trawl fishing; and (3) the

24   environmental benefits of catch share programs.  Id.

25                        **a.       Effects On Non-trawl Communities**

26          Plaintiffs argue that the EISs fail to take a hard look at the impact of Amendments 20

27   and 21 on non-trawl communities.  Pls.' Reply (dkt. 84) at 36-37.  The Court disagrees.

28

United States District Court
For the Northern District of California

1     Non-trawl communities are not directly affected by Amendment 20 (trawl

2   rationalization) or Amendment 21 (intersector allocation), but they are potentially affected

3   in secondary ways.  This is recognized and discussed by the Council and the NMFS.

4   B22:xx ("Non-trawl communities could be affected by rationalization through increased

5   competition, gear conflicts, impacts on the support sector, infrastructure impacts, and

6   competition in the marketplace."); B22:402-409 (describing "[p]otential impacts [that] could

7   result from potential spillover effects from a rationalized trawl fishery" including, for

8   example, "if non-trawl sectors rely on the presence of trawl harvesters to maintain the

9   presence of processors and support businesses, the departure of trawl vessels from a port

10  may have geographic consequences to non-trawl harvesters"); C20:*21 ("Non-trawl

11  communities could be affected by rationalization through increased competition, gear

12  conflicts, impacts on the support sector, infrastructure impacts, and competition in the

13  marketplace."); B22:409 ("[N]ontrawl harvesters should be adversely impacted compared to

14  the no action alternative.  In addition, pink shrimp harvesters are expected to be adversely

15  impacted by increased participation of trawl harvesters in the pink shrimp fishery.");

16  B22:509 ("Non-trawl communities could be affected by rationalization in several ways"

17  including (1) increased competition; (2) gear conflicts; (3) impacts on the support sector; (4)

18  infrastructure impacts; and (5) marketplace impacts.).[21]

19     The discussion of non-trawl fishing communities is less robust than the discussion of

20  trawl fishing communities, but the question is not whether the attention paid to non-trawl

21  communities was the same as that paid to trawl communities (who are more directly

22  impacted).  Rather, the question is whether the NMFS "succinctly describe[d] the

23

24

25

26

27  ────────────

    [21] Plaintiffs argue that some of the record cited to by Federal Defendants as showing a discussion
    of impacts on non-trawl fishing communities shows instead a discussion of impacts on non-trawl
28  harvesters, not the communities that support them. Pls.' Reply (dkt. 84) at 37 n.34.  Although true, a
    discussion of the impact on non-trawl harvesters necessarily informs the impact on the shore-side
    communities that service those harvesters.

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

environment of the area(s) to be affected . . . by the alternatives under consideration."  40

C.F.R. § 1502.15.  It did.[22]

### b.     Comparative Environmental Benefits Of Non-trawl Fishing Versus Trawling

Plaintiffs claim that the EISs fail to include a sufficient (or any) discussion of the

comparative impacts of trawl and non-trawl gear.  See, e.g., Pls.' Reply (dkt. 84) at 39 ("The

ultimate problem . . . is that at the end of the day defendants chose to disregard the issue,

declining to consider the relative environmental merits of allocating the bottom fish to the

trawlers as compared to the fixed-gear participants.").

Under the existing FMP, trawling is permitted and trawlers bring in the majority of

the catch.  Neither of those things changes much under Amendments 20 and 21, except that

Amendments 20 and 21 will likely reduce the amount of trawling (through fleet

consolidation) and allocate more fish to non-trawlers than their historical catch rates show

they have obtained.  NEPA requires an analysis of alternatives actually considered (the

various IFQ options and intersector allocation approaches identified in the EISs) and not a

hypothetical set of options outside the scope of the present agency action.  See Nat. Parks

and Conservation Ass'n, 606 F.3d at 1072.

That said, even assuming Amendments 20 and 21 combine to "fix" the trawl fleet's

place in the fishery beyond that already existing under the status quo, the EISs did address

---

[22] Federal Defendants argue that the EISs were not required to address economic impact on non-trawl communities at all because any economic harm they suffer as a result of Amendments 20 and 21 is not related to any identifiable environmental impact.  See 40 C.F.R. § 1508.14 ("economic or social effects are not intended by themselves to require preparation of an [EIS]."); see Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 944 (9th Cir. 2005).  But see Friends of Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1125 (8th Cir. 1999) ("The Outfitters claim that they have standing because the Final EIS fails to consider adequately the economic impact on local economies and the Final EIS is based on flawed data or an incomplete analysis of alternative plans. These concerns are explicitly referenced in the provisions of NEPA, which the Forest Service has applied in this case, and its implementing regulations. . . . . In several contexts, the Final EIS discusses the economic setting and the economic implications of the available alternatives. Additionally, the Outfitters assert their own inability to fully enjoy the BWCA Wilderness as a result of the visitor use restrictions, a claim which is closely related to the physical environment and which the Final EIS addresses. Thus, we conclude that the Outfitters' claims are all arguably within the zone of interests protected by NEPA, and the Outfitters have prudential standing to assert their NEPA claims.").  For purposes of this analysis, the Court assumes that Plaintiffs have standing to assert that Federal Defendants failed to consider the economic impact on non-trawl communities and that such argument is cognizable under NEPA.

**United States District Court**
For the Northern District of California

comparative gear impact analysis, incorporated discussion of such impacts from recent prior amendments,[23] and explained that further study on differential impacts is required before making a determination as to relative impact between gear types.  See, e.g., D50:21 ("[S]ome commenters on the draft EIS contend that the use of non-trawl gear has less environmental impact than trawl gear.  NMFS believes the evidence for this contention is inconclusive and that further research is necessary to determine the relative impacts of different gears that may be used to harvest Amendment 21 species.").  The record shows that a "hard look" was taken at the impact of trawl versus non-trawl fishing against the backdrop of the existing FMP and the work already done by the Council and the NMFS assessing gear impact in prior Amendments.

### c.    Environmental Benefits Of Catch Share Programs

Plaintiffs also take issue with the NMFS's determinations about the benefits of catch share programs like the one implemented in Amendment 20.  They note, for example, that although the IFQ might have a beneficial impact on the fishery overall, the Council and the NMFS never explain why the particular provisions they included in this IFQ program are necessary.  "[I]mproved enforcement (through observers or electronic monitoring systems) and direct limitations on bycatch could have been achieved in other ways, or in combinations that did not include the long-term gifting of this public resource to a limited number of trawlers, based upon their track record of being the most intensive, environmentally damaging participants in the fishery."  Pls.' Reply (dkt. 84) at 41.

Plaintiffs' NEPA-based argument regarding the environmental impacts of catch share programs appears to be a challenge to the Council's interpretation of the available science, because the record reflects that the Council reviewed and discussed considerable scientific evidence regarding catch share programs.  B22:244-68 ("In this section, we draw heavily on available literature to describe the reasons for implementing rationalization programs in other fisheries, their effects, and the likely implications of rationalization for the west coast

---

[23] 40 C.F.R. § 1502.21 provides that "[a]gencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action."

40

United States District Court
For the Northern District of California

1  trawl fishery."); 648-49 ("The commenter further claims that the bycatch reduction objective

2  is not supported by analysis, and argues that the main piece of empircal evidence used to

3  model possible bycatch reduction scenarios, results from an exempted fishing permit (the

4  'arrowtooth EFP'), is of limited applicability, which is not acknowledged in the DEIS.  In

5  fact the uncertainties associated with using the EFP data are disclosed and discussed in

6  Appendix C (on page C-19), containing detailed documentation of the models used in

7  support of the impact analyses.").

8       Plaintiffs might disagree with the Council's and the NMFS's takeaway from the

9  scientific studies they discussed, but the "choice of what information to rely upon is

10 properly within the discretion of the agency, and the decision not to rely on a specific report

11 does not render the environmental impact [statement] arbitrary and capricious." Defenders

12 of Wildlife, Earth Island Inst. v. Hogarth, 330 F.3d 1358, 1371 (Fed. Cir. 2003).

### 5.    The NMFS's Treatment Of Incomplete Or Unavailable Information Was Appropriate

15      Plaintiffs challenge the following statement as violating NEPA's requirements related

16 to scientific uncertainty.

> [S]ome commenters on the draft EIS contend that the use of non-
> trawl gear has less environmental impact than trawl gear.
> NMFS believes the evidence for this contention is inconclusive
> and that further research is necessary to determine the relative
> impacts of different gears that may be used to harvest
> Amendment 21 species.  Accordingly, studies are planned to be
> conducted in the future to evaluate the differential
> environmental effects of various gear on bottom habitat in West
> Coast groundfish fisheries so as to provide more definitive
> conclusions on habitat impacts.

22 D50:21; see Pls.' Mot. for Summ. J. (dkt. 71) at 53.  Plaintiffs argue that this was indicative

23 of an impermissible punt on the question of comparative gear impacts because the science

24 actually shows that non-trawl is superior to trawl.  See 40 C.F.R. § 1502.22(b).[24]

---

[24] This regulation provides in pertinent part as follows:

> When an agency is evaluating reasonably foreseeable significant adverse
> effects on the human environment in an environmental impact statement
> and there is incomplete or unavailable information, the agency shall
> always make clear that such information is lacking.

1    Assuming *arguendo* that the NMFS was required to consider comparative gear

2    impacts even though Amendment 20 affected only the trawl sector and Amendment 21

3    allocated more of the fishery to non-trawl fishers than their historical catch rates show that

4    they bring in, the record reveals that the NMFS reviewed available scientific information,

5    including incorporating by reference from recent Amendments, and made an expert

6    determination about what was scientifically supportable and what was not.  D50:2; see also

7    B23:196-97 ("Although, in general, NMFS noted that trawl gear does have greater impact

8    than fixed gear for a given habitat type, if allocation changes lead to greater effort by fixed

9    gear in currently untrawled, biogenic habitats, overall impacts to habitat may actually

10   increase. . . . .  In conclusion, while NMFS believes that using allocation to promote

11   conservation shows promise, 'it would be premature to make a long-term allocation

12   decision' based on this factor alone.  Instead, NMFS proposed further research in this area,

13   ideally concluding in time to inform the Council and NMFS at the 5-year review of the trawl

14   rationalization program, if it is approved. . . . .  On balance, the science supports NMFS'

15   position that more research is needed prior to making an allocation decision between gear

16   types to reduce bycatch or habitat impacts.  Given the spatial scales of experimental results,

17   incomplete habitat maps, and trawl effort reporting data, it is difficult to assess the

18   _____

19          . . . .

20          (b) If the information relevant to reasonably foreseeable significant
       adverse impacts cannot be obtained because the overall costs of obtaining
21     it are exorbitant or the means to obtain it are not known, the agency shall
       include within the environmental impact statement:
22
            (1) A statement that such information is incomplete or unavailable; (2)
23     a statement of the relevance of the incomplete or unavailable information
       to evaluating reasonably foreseeable significant adverse impacts on the
24     human environment; (3) a summary of existing credible scientific
       evidence which is relevant to evaluating the reasonably foreseeable
25     significant adverse impacts on the human environment, and (4) the
       agency's evaluation of such impacts based upon theoretical approaches
26     or research methods generally accepted in the scientific community. For
       the purposes of this section, "reasonably foreseeable" includes impacts
27     which have catastrophic consequences, even if their probability of
       occurrence is low, provided that the analysis of the impacts is supported
28     by credible scientific evidence, is not based on pure conjecture, and is
       within the rule of reason.

1    ecosystem-level effects of trawling.  With a lack of credible research on gear other than

2    trawl, it is premature to make allocation decisions between sectors based on differential

3    impacts.").

4          The record does not support the conclusion that the NMFS ducked the existence of

5    negative information concerning trawling.  Rather, the record shows that the available

6    evidence was considered and a conclusion about what that evidence showed was reached.

7    See Naturtal Res. Def. Council v. Evans, 254 F. Supp. 2d 434, 443 (S.D.N.Y. 2003)

8    (reasonable treatment of impact of bottom-tending mobile gear on tilefish habitat where the

9    NMFS indicated lack of evidence on that issue and a plan existed to study such impacts

10   going forward).

11         The NMFS met its obligations with respect to dealing with scientific evidence and

12   took a hard look at differential impacts of trawl versus non-trawl fishing within the

13   framework of the existing FMP and Amendment 20's and Amendment 21's place within it.

14         Nor is this analysis altered by either of the cases upon which Plaintiffs primarily rely

15   to support their argument that the Council and the NMFS mishandled their obligations to

16   deal with conflicting or uncertain science.

17         First, Plaintiffs cite Center for Biological Diversity v. U.S. Forest Serv., 349 F.3d at

18   1167, for the proposition that an agency must "make available to the public high quality

19   information, including accurate scientific analysis, expert agency comments and public

20   scrutiny, before decisions are made and actions are taken."  Pls.' Mot. for Summ. J (dkt. 71)

21   at 53; see also 40 C.F.R. 1500.1(b) ("NEPA procedures must insure [sic] that environmental

22   information is available to public officials and citizens before decisions are made and before

23   actions are taken. The information must be of high quality. Accurate scientific analysis,

24   expert agency comments, and public scrutiny are essential to implementing NEPA.  Most

25   important, NEPA documents must concentrate on the issues that are truly significant to the

26   action in question, rather than amassing needless detail.").

27         The NMFS complied with regulatory and Circuit precedent when it discussed the

28   available science on differential gear impacts and concluded that it could not justify making

43

United States District Court
For the Northern District of California

1   decisions based on what it concluded to be insufficient data.  Further, unlike in Center for

2   Biological Diversity, where diverging scientific opinion undercut the core support for the

3   agency's decision, the differential gear impacts analysis that Plaintiffs assert the NMFS did

4   not adequately consider was not "the scientific basis upon which the Final EIS rest[ed] and

5   which [was] central to it[.]"  Id. at 1167.  Rather, the core support for the NMFS's decision

6   to enact Amendment 20 is the evidence supporting the benefits of trawl rationalization as

7   compared to status quo management.  Similarly, the core support for the NMFS's decision

8   on how to structure intersector allocation (Amendment 21) is the historical status quo catch

9   rates, the NMFS's belief based on the status quo management plan that trawling is critical to

10  achieving optimum yield, and the lack of scientific consensus on how large-scale shifts from

11  trawling to fixed gear will affect the fishery.  Plaintiffs' implicit suggestion is that the

12  NMFS should have credited science it deemed equivocal on the differential impacts of gear

13  types and then presumably used that equivocal science to work a sea change in how

14  groundfish are caught in the fishery.  NEPA does not require such a result.

15      Second, Plaintiffs quote from Oregon Natural Resource Council v. Goodman, 505

16  F.3d 884, 893 (9th Cir. 2007) to support their assertion that the NMFS improperly deferred

17  the analysis and evaluation of differential gear impacts.  In that case, the Ninth Circuit

18  determined that an EIS was insufficient for failing to discuss the "underlying data

19  supporting the assertion in language intelligible to the public."  Id.; Pls.' Mot. for Summ. J.

20  (dkt. 71) at 54.  That did not occur here.  The NMFS discussed the state of the "underlying

21  data" on differential gear impacts and determined that it was inconclusive.  D50:21;

22  B23:196-97.

23          **6.      The NMFS Properly Addressed Mitigation In The Records Of
                       Decision And EISs**

24  NEPA regulations require an agency's Record of Decision to "[s]tate whether all

25  practicable means to avoid or minimize environmental harm from the alternative selected

26  have been adopted, and if not, why they were not."  40 C.F.R. § 1505.2(c).  However, "a

27  mitigation plan need not be legally enforceable, funded or even in final form to comply with

28  NEPA's procedural requirements."  Nat. Parks & Conservation Ass'n v. U.S. Dep't of

44

**United States District Court**
For the Northern District of California

1  Transp., 222 F.3d 677, 681 n.4 (9th Cir. 2000) (citation omitted).  Plaintiffs argue that

2  Amendments 20 and 21 fail to satisfy section 1502.2(c) because (1) Amendment 20's

3  principle mitigation component (the AMP) is speculative and undefined; and (2)

4  Amendment 21 has no mitigation component at all.  The Court disagrees.

5  Amendment 20 is a mitigative measure (or, at worst, is neutral) with respect to the

6  natural environment because trawl fleet consolidation, gear switching, and observer

7  monitoring are likely to mitigate environmental impacts relative to the status quo.  Plaintiffs'

8  concerns about mitigation focus instead on shoreside negative impacts (particularly within

9  the non-trawl communities).  Amendment 20 contains provisions designed, at least in part,

10  to mitigate shoreside impacts.  (For example, the ability of fishing communities to obtain

11  Quota Share, restrictions on ownership of Quota Share, maintenance of the split between

12  shoreside and at-sea processing, and the AMP).  It is true that the AMP is imprecise as to

13  how Quota Share will ultimately be used to mitigate negative program impacts, but this is

14  because, although the Council and the NMFS felt that they could predict with reasonable

15  certainty that negative impacts will occur, they felt they could not predict with reasonable

16  certainty what those impacts would be or where they would hit hardest.  Further, the NMFS

17  discussed impacts and potential mitigative measures within Amendment 20 (including the

18  AMP)[25] to ensure that the environmental consequences were fairly evaluated.  See Nat.

19

---

20  [25] Plaintiffs argue that the AMP is "a mere laundry list of measures that might be adopted in the
future," which is impermissible because "[a] mitigation discussion without at least some evaluation of
21  effectiveness is useless in making [a] determination" as to "whether anticipated environmental impacts
can be avoided."  Pls.' Reply (dkt. 84) at 44 (quoting S. Fork Band Council of W. Shoshone of Nev. v.
22  U.S. Dep't of the Interior, 588 F.3d 718, 727 (9th Cir. 2009)).

23  The NMFS and the Council did include "some evaluation" of the AMP's ability to address
mitigation concerns.  For example, in response to a comment requesting more analysis of the adverse
24  effects on communities and how to mitigate those effects, the Council noted as follows:

25  Quantitative analysis of the potential impacts of delayed
implementation is hampered by lack of specifics about how the
26  program would function.[] The AMP would not change the total
amount of QP available to cover catch; instead it affects the distribution
27  of the QP reserved for the AMP.  The difference in the way QP or
resulting landings would be distributed due to the AMP and the
28  distribution based on initial quota allocations would depend on program
objectives and the particular distribution formula used.  Although the

**United States District Court**
For the Northern District of California

1    Parks & Conservation Ass'n, 222 F.3d at 681 n.4 ("[A] mitigation plan need not be legally

2    enforceable, funded or even in final form to comply with NEPA's procedural

3    requirements.") (citations omitted); Laguna Greenbelt, 42 F.3d at 528 (EIS acceptable where

4    it provides a "reasonably complete discussion of potential mitigation measures.").

> Council considered various approaches to how quota would be distributed under the AMP, no final recommendations for distribution formulas were identified as part of the preferred alternative. Without this information, it is not possible to quantify the differential effects of not implementing the program in the first two years.
>
> One of the uses of the AMP is to react to unanticipated and unintended consequences of the program. By definition, it is not possible to predict associated impacts of unanticipated consequences. Given these impediments to a quantitative prediction, the DEIS presents a qualitative description of the potential range of impacts and their intensity.
>
> With respect to the recommendation that the AMP should be implemented on day 1 of the program, it should be noted that it would still take time for the impacts of IFQ management to emerge and then to craft an appropriate response through the AMP. Thus, implementing the AMP on day 1 of year 3 may not in practice delay very much the application of AMP to emerging impacts compared to having a program framework set up on day 1 but still needing to identify the impacts that need to be addressed with AMP quota. Development of the AMP during the first two years of the program can take into account adverse impacts of the program as they emerge.

B22:645. See also D49:22 ("The mitigation measure incorporated into the proposed action and included in the preferred alternative . . . is the adaptive management provision, which annually sets aside up to 10 percent of the QPs in the shore-based IFQ fishery and up to 10 percent of the available aggregate harvest pounds for the Pacific whiting cooperative program. This harvest opportunity would then be allocated by the Council to meet specified objectives, including unforeseen impacts, such as geographic shifts in catch or landings, previously unidentified impacts to participants (e.g. processors), or unexpected barriers to new entry into the fishery."); B22:606 (same); B22:685 ("Regarding an AMP, as suggested by EPA, the DEIS describes the Council designed AMP that sets aside 10 percent of the shoreside nonwhiting individual fishing quota two years after initial program implementation. This quota set aside will be used to address unforeseen impacts on coastal communities, consistent with EPA recommendations. During the first two years of the program, the Council, working with NMFS and the states, will develop the infrastructure and program components necessary to effectively administer this mitigation program in the future."); B22:*1530 (similar).

This case is not like Neighbors of Cuddy Mountain v. U.S. Forest Service, where an EIS was deemed insufficient because it discussed only in the most "perfunctory" terms other possible mitigation measures that might address negative impacts but did not commit to any mitigation at all or describe in any way how the possible future mitigation measures addressed negative impacts in the areas most directly affected by the agency action. 137 F.3d 1372, 1380 (9th Cir. 1998). Here, the AMP (an existent mitigation measure even if its implementation details remain uncertain and it is not intended to take effect until negative impacts are ascertained) combines with other mitigative aspects of Amendment 20 to meet NEPA's requirements to take a "hard look" at mitigation.

46

Amendment 21 does not significantly alter the historical intersector allocation, and therefore does not require a discussion of mitigative measures.  B23:58 (Amendment 21 is "expected to have no differential direct impacts and potentially low indirect impacts to the west coast biological environment (i.e., affected species) or the physical environment (i.e., west coast marine ecosystems and EFH)."); D50:24 ("FEIS did not specifically discuss mitigation measures because the proposed action is primarily intended to maintain historical harvest distribution of effort amongst sectors.").  Indeed, Plaintiffs do not seem to focus their mitigation argument on Amendment 21, instead homing in on the insufficiency of Amendment 20's AMP.  Pls.' Reply (dkt. 84) at 43-44.

Thus, the NMFS complied with its obligations under NEPA to address mitigation and take a hard look at environmental impacts.

## IV.   CONCLUSION

For the foregoing reasons, Federal Defendants' Motion for Summary Judgment is GRANTED, and Plaintiffs' Motion for Summary Judgment is DENIED.

**IT IS SO ORDERED.**

Dated: August 5, 2011

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California